## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

**v.**                                              **Case No. 1:21-cr-207-TNM**

**MATTHEW COUNCIL**
_____/

### SENTENCING MEMORANDUM

This Court should sentence Mr. Council to five years' probation, with special conditions requiring that he serve a period of home detention, provide community service, and receive mental health treatment.

### BACKGROUND

No one understood quite how sick Matt is until he tried to slit his throat with a box cutter. Matt grew up in a supportive and loving household, the youngest of four siblings, with his parents married. He started at what would become his lifelong passion at young age, playing football in a police league. But mental illness runs in the family, and Matt showed signs of disturbance early in life. Matt's grandmother committed suicide and was a schizophrenic, and Matt's oldest sister has bi-polar disorder. By the age of 10, Matt was drinking alcohol and had attempted suicide by overdosing on pain medication. As defense expert Dr. Scot Machlus notes, family history of schizophrenia or bi-polar disorder is a top indicator of bi-polar disorder, and alcohol-use disorder is closely associated with bi-polar disorder.

With the strong support of his family and the pathways opened by being a star football player, Matt made his way to West Virginia University on scholarship. But his mental illness led to a led to a confrontation with a resident assistant, and he was forced to transfer within his first year to Liberty University, where he again played football.

While football opened many doors for Matt, the sport also took a terrible toll on his body, and probably his mind. Matt suffered multiple injuries, especially to his back and spine. Today he suffers chronic pain, and his diagnoses include spinal stenosis, a herniated disk, rotator cuff injuries, chronic migraines, occipital neuralgia, myofascial pain, post-concussion syndrome and a litany of others. He cannot drive because he suffers from frequent seizures. He suffers from tardive dyskinesia, normally associated with long-term use of psychiatric drugs. It causes involuntary movements, including excessive rocking while sitting. The Court may notice this symptom during the sentencing hearing – if distracting, it is not intended as such, but rather is involuntary.

Matt and his medical providers think he has chronic traumatic encephalopathy (CTE), the poorly understood degenerative brain disease linked to repeated blows to the head, and made notorious by its prevalence among former National Football League players. In early stages, CTE can cause cognitive impairment, memory loss, impairment of executive functions, impulsive behavior, depression, substance misuse, and suicidal thoughts and behavior, and leads to

2

dementia.[1]  Matt has all these symptoms, but the disease can only be confirmed after death.

At Liberty, Matt met and married Jodie, who became pregnant with Matt's daughter, Bria.  Hampered by football injuries and the stress of a child on the way, and after ceasing the use of medication he had been prescribed, Matt had a few strange behavioral incidents, and then later dropped out of college.  He found employment in marketing and sales, but would always abruptly quit.  He divorced Jodie.  Eventually, he earned certifications as a medical assistant, and used these to begin teaching at a vocational high schools and colleges.  Here, he truly thrived for a time.  His students excelled and he coached and volunteered the school's football and track teams.  While fundraising for his students, he said, "The first time a student told me she was homeless, I was in the middle of telling her she could not pass the class if she didn't turn in a major project . . . .  I had to quickly leave the classroom so I didn't cry in front of her . . . .  I could fill a book with stories of their hardships, but that would overshadow my kids' accomplishments."[2]

By then, Matt was re-married to Adrianna.  The relationship began to suffer, Matt had two affairs, and the couple began the process of divorcing.  But even while

---

[1]    "Chronic     Traumatic     Encephalopathy,"     Mayo     Clinic,     *available     at* https://www.mayoclinic.org/diseases-conditions/chronic-traumatic-encephalopathy/symptoms-causes/syc-20370921.

[2]    https://projects.tampabay.com/projects/2022/investigations/list-every-january-6-riot-arrest-tampa-bay-florida/

the marriage was deteriorating, Matt and Adrianna adopted three children out of the foster care system.  Matt explains that he knew his marriage was coming to an end, but he felt the foster system was too poor and the children would end up on the streets.  He explained that "his conscience could not leave them in the system."  Very shortly after the adoption, Matt and Adrianna divorced, and Matt became severely depressed.  He sent much of his teacher's salary to Adrianna for the children, lived in a rented room in a house, ate from the dollar store, and rode a bicycle to work.  But his family had no idea anything was wrong because he never complained.

About this time, in 2016, Matt showed his first sign of delusional thinking.  He simply came to believe, without evidence, that the school's football players were raping one of the girls in the locker room.  He sought to intervene by "investigating," and next came to believe that he himself would be accused of untoward conduct with the girl.  None of this was true, but Matt became further depressed and felt a great deal of pressure.  In this state, he attempted to slit his carotid arteries with a box cutter.  A roommate found him unconscious, and he was hospitalized, first for his injuries and then psychiatrically.  He was diagnosed with major depressive disorder, severe, recurrent, and prescribed medications.

That was the last time Matt lived or worked on his own.  When he emerged from his hospitalization he moved home with his parents, Claude and June, who are now in their 80's.  He received disability payments for his mental and physical ailments.  He cannot drive because of his seizures, so his family takes him to his

appointments and to get his medicines.  Claude describes himself as Matt's "care giver" (and father and best friend).

On December 30, 2020, about a week before the instant offense, Claude wrote an email to Matt's psychiatrist:

> For the last 6 to 8 months Matt has been erratic in a few areas.  He has been spending most of his time on Twitter.  He is a digital soldier in General Flynn's army.  And he spends his days trying to convince others on Twitter to believe in Trump.  And points out the deep state corruption and devious ways.  He has been kicked off Twitter many times, 12 or so times permanently.  He reopens fictitious Twitter accounts to keep going.  Up sometimes at 3:00 AM.  He shows us everything that he sends out online and is hyper focused on all current events relating to politics . . . .  June and I are in our late 70s and don't see the meaning in most that he sends out.  This really frustrates him and we think he is crazy.  His siblings and daughter are also concerned with his doings online . . . .  Mentally – I will give you a few words that seem to be where he is at.  Agitated, loud, gross, impulsive, irritable, paranoid, anxious, depressed, sleep troubles, irrational fears, he won't do his meds.  His mother has to keep the many pills that he takes current and monitor that he will remember to take them.  He his very forgetful and disinterested in doing tasks or managing his affairs he has a good appetite.  The birds on the pond that he feeds are his only friend.

***

Matt planned with his brother-in-law, Allen Bradley, to attend President Trump's speech on January 6, 2021.  Allen and Matt discussed their motivation for the trip – it would be a once in a lifetime experience to see the president's final speech in person, something they could talk about in the future.  Matt flew to Allen's

home in North Carolina, and the pair drove from there to Washington, D.C., on January 5, 2021, where they stayed in a hotel.  During the drive Matt was able to carry on a conversation and was pleasant, joking and laughing even when the two disagreed.  They got to the hotel room, Matt had two or three beers and took his medicine, and then they went to bed.

According to Mr. Bradley, after that, Matt "snapped."  At 3:00 a.m. on January 6, 2021, Matt woke Allen up and insisted they make their way down to the National Mall.  Allen tried to reason with Matt, telling him that no one would be there yet and there was no reason to go, but Matt would not relent.  For the next three hours, Matt spoke endlessly about conspiracy theories involving the "deep state" and organizations determined to remove President Trump from office.  Matt's speech was pressured, and he spoke without stopping.  He explained that during the speech, President Trump would reveal secrets that he had been keeping.  (Later, in a podcast interview, Matt explained that he believed President Trump would reveal that he had been conducting surveillance of election tampering with fly-mounted cameras).

At the rally, Matt found a group called the "Trump Train" and insisted they stay with the group.  Matt continued to talk incessantly, now about the Trump Train. People were packed together at the rally, and Allen wanted to move to get some space, but Matt insisted on staying put.  Allen had *promised* Matt's parents that he would make sure Matt got on an important call with the Social Security

Administration that would adjust his benefits.  Matt kept refusing, so Allen had to

threaten to leave him alone in Washington to get him to take the call.

***

> We beat them four years ago.  We surprised them.  We took
> them by surprise and this year they rigged an election.  They
> rigged like they've ever rigged an election before . . . .
>
> All of us here today do not want to see our election victory
> stolen by emboldened radical-left Democrats, which is what
> they're doing.  We will never give up, we will never
> concede.  It doesn't happen.  You don't concede when
> there's theft involved.
>
> Our country has had enough.  We will not take it anymore
> and that's what this is all about.  And to use a favorite term
> that all of you people really came up with:  We will stop the
> steal.  Today I will lay out just some of the evidence proving
> that we won this election and we won it by a landslide.  This
> was not a close election . . . .
>
> And by the way, does anybody believe that Joe had 80
> million votes?  Does anybody believe that?  He had 80
> million computer votes.  It's a disgrace.  There's never been
> anything like that.  You could take third-world countries.
> Just take a look.  Take third-world countries.  Their
> elections are more honest than what we've been going
> through in this country.  It's a disgrace.  It's a disgrace . . . .
>
> States want to revote.  The states got defrauded.  They were
> given false information.  They voted on it.  Now they want
> to recertify.  They want it back.  All Vice President Pence
> has to do is send it back to the states to recertify and we
> become president and you are the happiest people.
>
> And I actually, I just spoke to Mike.  I said:  "Mike, that
> doesn't take courage.  What takes courage is to do nothing.
> That takes courage."  And then we're stuck with a president
> who lost the election by a lot and we have to live with that

for four more years.   We're just not going to let that happen . . . .

But this year, using the pretext of the China virus and the scam of mail-in ballots, Democrats attempted the most brazen and outrageous election theft and there's never been anything like this.   So pure theft in American history. Everybody knows it . . . .

And Mike Pence is going to have to come through for us, and if he doesn't, that will be a, a sad day for our country because you're sworn to uphold our Constitution.

Now, it is up to Congress to confront this egregious assault on our democracy.   And after this, we're going to walk down, and I'll be there with you, we're going to walk down, we're going to walk down.

Anyone you want, but I think right here, we're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them.

Because you'll never take back our country with weakness. You have to show strength and you have to be strong.   We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated.

I know that everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard . . . .

We must stop the steal and then we must ensure that such outrageous election fraud never happens again, can never be allowed to happen again . . . .

And we fight.   We fight like hell.   And if you don't fight like hell, you're not going to have a country anymore . . . .

8

> So we're going to, we're going to walk down Pennsylvania
> Avenue.  I love Pennsylvania Avenue.  And we're going to
> the Capitol, and we're going to try and give . . . .
>
> So let's walk down Pennsylvania Avenue.

***

Allen Bradley had to go to the bathroom.  At this point they had been up since 3 a.m., on their feet and crammed among the crowd, and the speech they had come to see was over.  Allen told Matt they should go back to the hotel room to use the bathroom, and that there was no reason to stay.  There was no reasoning with Matt. He became belligerent and aggressive, and explained that they must march to the Capitol.  Allen went back to the hotel to use the bathroom, leaving Matt alone.

***

Matt was almost never alone – he had been living with his parents since 2016, when he cut his throat.  The chaos at the Capitol will be familiar to the Court. Outside, Matt was pepper sprayed in the face, but did not stop.  He made his way to a broken window, and then around to an emergency exit that he found already open and full of other protestors.  Ending up at the front of the crowd of protestors inside, Matt faced two lines of police officers.  Expecting others to follow, Matt opened his arms wide and barged into the first line officers, thinking the other protestors would fill the hole he was making.  As he approached, an officer pepper sprayed him in the face again, and he fell as he made contact with the line of officers.  When this happened, a female officer fell too, probably because Matt's legs got tied up with

9

hers.  This officer has never been identified.  Much later, returning to the hotel room, Matt explained that he tried to wrap his arms around the officer as he fell, to break her fall.  (In Matt's mind at the time, this meant it was not an "assault").  Matt was promptly arrested and did not resist.

Matt suffered one of his seizures, and began to go in and out of consciousness as the arresting officer processed the arrest and treated him for the pepper spray. Later, Matt asked the arresting officer if he had hurt anyone.  The arresting officer told Matt about the female officer that had fallen, and Matt expressed remorse, saying that he did not intend to injure anyone.

***

Things did not get better for Matt after January 6; they got much worse.  As Dr. Machlus explains, Matt's diagnosis on January 6 was bi-polar 1 disorder.  Now, however, his diagnosis is schizoaffective disorder, bipolar type.  Dr. Machlus writes, "It is apparent that he has had [bipolar 1 disorder] for many years and that he has had a deterioration of his mental health since his arrest on January 6, 2021."  In particular, Matt's mental health since his arrest has been characterized by delusions and hallucinations, made worse by alcohol use.  On pretrial release from this Court, Matt initially lived with his parents, but began to suffer paranoid delusions.  He mixed his medications with alcohol, and began to believe the neighbors were pedophiles and who had stolen his marijuana.  He screamed at the neighbors from the back porch, and when his father tried to get him to come inside, Matt pushed

him into a screen door.  Claude had to threaten Matt with a hammer to get him to stop, and the police arrested Matt.  When the police tried to talk to him he just said, "I want to die."  He was involuntarily committed after hearing voices at the jail, seeing guards point guns at him through the cell door, and identifying himself as an admiral in the Space Force.

When he was released, he moved in with his brother, also named Claude. The delusions persisted.  He came to think that Claude the younger and his partner were videorecording him using the bathroom and distributing the videos, and that the neighbors were working with the Biden family to report him to the FBI.  The neighbors were not home.

Matt lived in hotels.  While at one, sheriff's deputies attempted to serve process on him, and Matt barricaded himself in the room, claiming that people were trying to kill him.  He told his pretrial services officer that she was staying in a room next door to his, trying to blow up the floor beneath him so that he would fall through and could be beaten up.  He was psychiatrically hospitalized again.

He went to live with his parents again.  He came to believe that they were drugging and raping him, and surveilling him in the house.  Around this time, Dr. Machlus conducted his first evaluation of Matt:

> Mr. Council was oriented to person, place, date, and situation. His mood was agitated. His affect was congruent with his mood. His speech was circumstantial. He was able to be redirected back to the topic of questioning.  He was distractible.  His memory functioning was adequate for

> purposes of the evaluation.   Mr. Council reported
> continuing to hear voices.  He said that the voices sounded
> like Trump and Flynn and that the commented on what he
> was doing, being under surveillance, having a small penis,
> not brushing his teeth, and that he should take a shower.
> He said the voices also repeat what he says.  He noted that
> he only hears voices in certain places in the house including
> the bathroom, bedroom, and kitchen.   Delusional and
> grandiose thinking were noted.   He said that he has
> "prophesies."  He stated that he did not have thoughts of
> hurting himself or others.

Matt was hospitalized for the last time in March of 2022.

***

Whether it was the right combination of medicine, a change in living situation, or stopping the medical marijuana and alcohol, Matt has turned a corner since his last hospitalization.  One possibility is the re-introduction of the anti-psychotic drug Haldol.  This Court permitted Matt to change his residence from his parents' house to an assisted living facility, and he quit alcohol and marijuana completely.  About six weeks after his first evaluation of Matt, Dr. Machlus evaluated him again:

> Mr. Council was oriented to person, place, date, and
> situation.   His mood was appropriate to the evaluation
> situation.  His affect was flat.  His speech was mostly non-
> spontaneous.  His answers to questions were relevant and
> coherent.  He appeared to give good effort to the tasks that
> were presented to him.    He denied having present
> hallucinations.   Present delusional content was not noted.
> He stated that he did not have thoughts of hurting himself
> or others.

Bria Council is now 28, and her father and her adore each other.  Bria writes to the Court:

> A few years ago, he started to show signs of paranoia and I wasn't sure how to handle it.  He wasn't himself and for the first time in my life I didn't know how to talk to him.  With the help of mental health providers and the support of our family, he tried a few medleys of medications.  Through tears I used to say, "He's Matt 2.0, this is the best we're going to get."  He was overwhelmed by a mental illness that caused him to act out in ways he never would have before and I truly thought I would never get my dad back.  However, with his current housing situation and combination of medications, he has done a complete 180 and is back to his normal self.  A punishment to him now, for something he did during that time, would be like punishing a person for someone else's mistakes.

Matt's mother, June, writes:

> At present Matthew lives in a limited care facility . . . .  He really likes his new roommate and calls him sweet baby Rae.  Rae has MS.  Matt says for us not to be upset that he has a court order and he will suffer through.  I am very proud of Matthew for his great attitude.  He is exercising at the gym.  We pick him up 3 times a week to come be with us for the day.  We make his appointments for him to get insurance rides to his doctors.  We also take him.  His brothers and daughter Bria Council come to visit too.  I am very proud of my whole family who are supportive without judgment to help Matthew.  We all will continue to help him in any way we can.

Where before pretrial violation notices filed with this Court were a regular occurrence, since Matt's last hospitalization, the re-introduction of Haldol, the move to the assisted living facility, and Matt's cessation of alcohol or marijuana use, there

have been none.  Claude and June drove Matt from Florida to Washington and, on August 10, 2022, he pled guilty to all charges.

ARGUMENT

This Court should sentence Mr. Council to five years' probation, with special conditions requiring a period of home detention, community service, and mental health treatment.  Mr. Council's offense was closely related to his severe mental illness, he lacks any criminal history, and he has made substantial progress at rehabilitation since his arrest.  Such a sentence would be proportional with sentences imposed on others who have committed similar conduct with similar criminal records.  And a sentence of probation allows the Court to impose two additional years of supervision that would be unavailable if the Court were to opt for a period of imprisonment followed by supervised release.

In Mr. Council's view, the Sentencing Guidelines range is 10 to 16 months' imprisonment, falling within Zone C of the sentencing table.  On this view, a sentence of probation requires only a very slight downward departure or variance justified by Mr. Council's mental illness.  This Court should sustain Mr. Council's objections to the presentence report (PSR) for the reasons provided below.  But even if the Court does not sustain some or all of Mr. Council's objections, it should depart or vary downward to impose a sentence of probation in light of Mr. Council's mental illness.

14

**I.  The offense level is 12.**

A.  <u>The official-victim enhancement does not apply.</u>

The Government would apply the enhancement found at U.S.S.G. § 3A1.2(b)

to Count One and Count Two.  The applicable guideline provides in full:

> (Apply the greatest):
>
> (a) If (1) the victim was (A) a government officer or
> employee; (B) a former government officer or employee;
> or (C) a member of the immediate family of a person
> described in subdivision (A) or (B); and (2) the offense of
> conviction was *motivated by such status*, increase by **3**
> levels;
>
> (b)  If subsection (a)(1) and (2) apply, and the applicable
> Chapter Two guideline is from Chapter Two, Part A
> (Offense Against the Person), increase by **6** levels.
>
> (c)  If, in a manner creating a substantial risk of serious
> bodily injury, the defendant or a person for whose
> conduct the defendant is otherwise accountable –
>
>> (1) knowing or having reasonable cause to believe
>> that a person was a law enforcement officer,
>> assaulted such officer during the course of the
>> offense or immediate flight therefrom; or
>>
>> (2) knowing or having reasonable cause to believe
>> that a person was a prison official, assaulted such
>> official while the defendant (or a person for whose
>> conduct the defendant is otherwise accountable)
>> was in the custody or control of a prison or other
>> correctional facility,
>
> increase by **6** levels.

U.S.S.G. § 3A1.2 (italics added; bolding in original).[3]  In the commentary, the

Sentencing Commission elaborates on the emphasized phrase:

> ***"Motivated by such status"***, for purposes of subsections (a)
> and (b), means that the offense of conviction was motivated
> by the fact that the victim was a government officer or
> employee, or a member of the immediate family thereof.
> This adjustment would not apply, for example, where both
> the defendant and the victim were employed by the same
> government agency and the offense was motivated by a
> personal dispute . . . .

*Id.* § 3A1.2 cmt. n.3.

Thus, for the enhancement to apply, the defendant must have been motivated

to act by the victim's status as such, not some other reason.  Here, Mr. Council was

motivated to make contact with the police officers by a desire to clear space for other

protestors to enter the Capitol.  That the police officers were police officers was

entirely incidental; they simply stood in the way, whatever their status.  Thus, like

the feuding agency employees in the commentary's example, Mr. Council was not

---

[3] A word of caution on the amendment of this guideline.  The guideline was amended
in 2004 (amendment 663).  Previously, what appears now as subsection (c) had
appeared at subsection (b).  The amendment added a new subsection (b), as it now
appears, and shifted the material from the old subsection (b) to a new subsection (c).
This amendment has important implications for caselaw.  For example, *United States
v. Valdez-Torres*, 108 F.3d 385, 390 (D.C. Cir. 1997), decided before the amendment,
interprets what is now subsection (c), and so does not control as to the current
subsection (b).  Similarly, although *United States v. Rivera-Alonzo*, 584 F.3d 829, 836-37
(9th Cir. 2009), might seem to favor the Government, the cases on which it relies,
*United States v. Hernandez-Sandoval*, 211 F.3d 1115, 1117-18 (9th Cir. 2000), and *United
States v. Alexander*, 48 F.3d 1477, 1493 (9th Cir. 1995), pre-date the amendment.  *Rivera-
Alonzo* also interprets the current subsection (c), and not the current subsection (b).

motivated by the victims' "status" as police officers, and the enhancement does not apply.

To be sure, at least two courts of appeals would likely support the Government's position that the enhancement applies in this case. *See United States v. Williams*, 520 F.3d 414, 424 (5th Cir. 2008); *United States v. Talley*, 164 F.3d 989, 1003-04 (6th Cir. 1999). In *Williams*, the defendant was a federal prisoner who attacked a corrections officer after the defendant claimed that the corrections officer touched him inappropriately during a pat-down search. 520 F.3d at 417-19. The district court applied the official-victim enhancement because the attack "stemmed from the official exercise of official duties" by the victim. *Id*. at 424.

Relying on the Sixth Circuit's opinion in *Talley*, the Fifth Circuit explained, "We have previously never considered an argument similar to that advanced by Williams: namely, that the assault was motivated not by Officer Bordelon's official status, but by his inappropriate touching, which was more akin to a personal dispute." *Id*. The Fifth Circuit upheld the enhancement, stating, "Here, the sole reason Williams's allegation of improper touching by Officer Bordelon arose was because Officer Bordelon was employed as a corrections officer at USP Pollock. Accordingly, we agree with the district court that Williams's assault was motivated by Officer Bordelon's status." *Id*. *See also Talley*, 164 F.3d at 1004 (upholding the enhancement against a defendant who solicited the murder of an FBI agent to

17

prevent the agent's testimony, on the theory that the agent's employment was the sole reason for his being a witness).

The problem with these courts' reasoning is that it runs headlong into the guideline's plain language, and the commentary's "personal dispute" elaboration. The enhancement applies if the victim held a given status and "the offense of conviction was motivated by such status." U.S.S.G. § 3A1.2(a). It must be the victim's status that motivates the defendant, not some other fact without which the defendant would not have acted. The guideline does not say "because of" the victim's status, but the Fifth and Sixth Circuits apply a but-for causation standard to the phrase "motivated by." *See Talley*, 164 F.3d at 1004 ("Indeed, the very reason that Young was a witness was *because* of his official status his official status as an FBI agent investigating Talley's case."). Under this standard, these courts apply the enhancement so long as the defendant would not have acted but for the officer's status, even if that status was not itself a reason or motivation for the conduct. *Cf. Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1739 (2020) (explaining that a statute that uses the phrase "because of" requires but-for causation, and "[t]hat form of causation is established whenever a particular outcome would not have happened 'but-for' the purported cause. In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause") (citation omitted).

18

As *Williams* and *Talley* would have it, so long as the defendant would not have acted but-for the victim's official status, the enhancement applies.  But the guideline does not say "because of," it says "motivated by."  And the commentary's "personal dispute" elaboration nicely illustrates why mere but-for causation is insufficient.  Two agency employees in a workplace dispute would not be feuding but for their shared employment, just as the victim and the defendant in *Williams* would not have been feuding but for the victim's employment as a corrections officer.  As the commentary establishes, although the personal dispute would not have arisen but for the official status of each employee, that causation is insufficient to trigger the enhancement.  Instead, a defendant's conduct must be "motivated by" the victim's status.

For this reason, the district court's opinion in *United States v. Kohut*, 553 F. Supp. 3d 964, 971 (D.N.M. 2021), provides the better view of the guideline.  There, the victim was a postal worker delivering the mail at the defendant's home.  The defendant brandished a knife at the victim and demanded a cigarette, and then threw the knife at the victim when he did not provide the cigarette.  *Id.* at 966-67.  Ruling that the official-victim enhancement was inapplicable, the court explained,

> Even though Kohut had time to realize that [the victim] was a postal worker, nothing about Kohut's conduct indicates that [the victim's] official status motivated his actions. Kohut could have done the same thing if [the victim] had been a neighbor or a passerby out for a walk.  The Court, therefore, agrees with Kohut that there is no evidence in the record to suggest that Mr. Kohut's actions were motivated

19

> by anything other than symptoms of his mental illness and
> a desire for a cigarette.

*Id.* at 971 (quotation and citation omitted).  Of course, the postal worker was not a

neighbor or a passerby out for a walk, and he would not have been on the

defendant's front lawn to be victimized "but for" his status as a postal worker.  But

the defendant was not "motivated by" the victim's *status*, so the enhancement did not

apply.

The same reasoning applies here.  The police officers could have been anyone

standing in the way of the protestors, such as counter-protestors or private vigilantes,

and Mr. Council would have tried to push them away to make way for the protestors

behind him.  He was not "motivated by" the police officers' *status* as police officers.

The enhancement therefore does not apply.

B.  Mr. Council did not intend to commit a felony when he trespassed.

For Count Three, charging Mr. Council with entering or remaining in a

restricted building or area, the applicable guideline is U.S.S.G. § 2B2.3.  That

guideline provides a cross reference "[i]f the offense was committed with the intent to

commit a felony offense . . . ."  *Id.* § 2B2.3(c)(1).  The cross reference directs the

court to the guideline for attempts and conspiracy, which in turn generally directs the

court to the guideline for the substantive offense.  *See id.*

The Government claims that Mr. Council intended to commit the offense

charged in Count One, the civil disorder related to Mr. Council's contact with the

20

police officer.  The Government's position is incorrect because there was no temporal concurrence between Mr. Council's act of trespass and his intent to assault the police officer.

The cross-reference applies if the defendant committed the trespass offense "with the intent" to commit a felony.  U.S.S.G. § 2B2.3(c)(1).  This provision invokes the familiar criminal law requirement of mens rea.  *See Ruan v. United States*, 142 S. Ct. 2370, 2376-77 (2022).  Where a mental-state like this is established, there must generally be "concurrence of an evil-meaning mind with an evil-doing hand . . . ."  *See Morissette v. United States*, 342 U.S. 246, 251 (1952).  "With those crimes which require some mental fault (whether intention, knowledge, recklessness, or negligence) in addition to an act or omission, it is a basic premise of Anglo-American criminal law that the physical conduct and the state of mind must concur."  1 Wayne R. LaFave, *Substantive Criminal Law* § 6.3(a) (3d ed. 2022 update) (citations omitted).  At a minimum, there must be temporal concurrence between the proscribed act and the proscribed mental state, such that the act is committed "with" the required mental state.  *See id*.

One treatise explains:

> Temporal concurrence is absent if the *actus reus* precedes the *mens rea*.  For example, suppose that *D1* breaks into and enters *V1*'s home at night in order to escape the cold.  After she enters, *D1* decides to steal *V1*'s property.  *D1* is prosecuted for burglary, defined as "breaking and entering the dwelling house of another at night, with intent to commit a felony therein."  On these facts, *D1* is not guilty

21

> of burglary because the specific intent of the offense ("intent to commit a felony therein") arose *after* the occurrence of the voluntary acts that caused the social harm of burglary ("breaking and entering the dwelling house of another at night").

Joshua Dressler, *Understanding Criminal Law* § 15.02(B) (4th ed. 2006).

Here, Mr. Council did not commit the trespass offense "with" the intent to commit a felony, because he did not form the intent to commit any felony until after committing the trespass. The statute under which Count Three is charged prohibits "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority to do so." 18 U.S.C. § 1752(a)(1).[4] The Government claims that Mr. Council committed this offense "with" the intent to commit the felony charged in Count One, the civil disorder and contact with the police officer. But the evidence does not establish that Mr. Council had already formed the intent to assault a police officer when he entered the Capitol grounds or building. Instead, the evidence shows

---

[4] The statute provides two means by which it may be violated, entering or remaining in the restricted area. Thus, Congress has protected against a defendant who enters a restricted area already established, and against one who knowingly remains after the restricted area has been established, or after losing authorization to be there. *Cf. United States v. Canals-Jimenez*, 943 F.2d 1284, 1287-88 (11th Cir. 1991) (interpreting 8 U.S.C. § 1326(a)(2), which prohibits deported aliens from "enter[ing], attempt[ing] to enter, or [being] at any time found in, the United States," and holding that the statute separately prohibits "entering" and being "found in" the United States, to protect against aliens who attempt to enter at a recognized port of entry as well as aliens who enter surreptitiously and are found only later). Here, Mr. Council's guilty plea uses alternative language. Doc. 55 at 6 ("The defendant admits that he entered or remained in a restricted building or on restricted grounds without lawful authority to do so and that he did so knowingly"). The evidence establishes an "entering" offense, not a "remaining" offense.

that Mr. Council made his way across the Capitol grounds and into the building, where he was confronted with the line of police officers.  Only then did he form the intent to run into the police officer.  There was no "temporal concurrence" of act and mental state, such that Mr. Council did not violate § 1752(a)(1) "with the intent to commit a felony offense" within the meaning of § 2B2.3's cross-reference.  The cross-reference is therefore inapplicable.

      C.  <u>The guideline applicable to Count Four is § 2B2.3.</u>

      The Government would apply U.S.S.G. § 2A2.4, dealing with obstructing or impeding officers, to Count Four, which charges a violation of 18 U.S.C. § 1752(a)(2), prohibiting disorderly and disruptive conduct in a restricted area.  The Guidelines explain the procedure for determining the applicable guideline this way: "Determine the offense guideline in Chapter Two (Offense Conduct) applicable to the offense of conviction (*i.e.*, *the offense conduct charged in the count of the indictment or information of which the defendant was convicted*)."  U.S.S.G. § 1B1.2(a) (emphasis added).  As courts have repeatedly concluded, this language limits the court to a review of the charging instrument to determine the applicable guideline, not a broad review of the evidence.  *See United States v. Jennings*, 991 F.2d 725, 733 (11th Cir. 1993) ("Thus, the appropriate guideline section is determined solely by conduct charged in the indictment for which the defendant has been convicted"); *United States v. Street*, 66 F.3d 969, 979 (8th Cir. 1995); *United States v. Partee*, 31 F.3d 529, 531 (7th Cir. 1994) (citations omitted).

The statutory index provides two possible offense guidelines for violations of 18 U.S.C. § 1752, § 2A2.4 (dealing with the obstruction of officers) or § 2B2.3 (dealing with trespass).  U.S.S.G. app. A at 567.  "In the case of a particular statute that proscribes a variety of conduct that might constitute the subject of different offense guidelines, the Statutory Index may specify more than one offense guideline for that particular statute, and the court will determine which of the referenced guideline sections is most appropriate for *the offense conduct charged in the count of which the defendant was convicted*."  *Id.* § 1B1.2 cmt. n.1 (emphasis added).

Count Four provides in full:

> On or about January 6, 2021, within the District of Columbia, **MATTHEW COUNCIL**, did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions.

Doc. 35.  Thus, the language of Count Four says nothing about "officers" or anyone other than the Vice President.

Section 2A2.4 is entitled "Obstruction or Impeding of Officers."  The provision is located in the Part entitled "Offenses Against the Person" and in the Subpart entitled "Assault."  Section 2B2.3, by contrast, is simply entitled "Trespass," and is located in the Part entitled "Basic Economic Offenses," and the Subpart

24

entitled "Burglary and Trespass." Thus, § 2A2.4 is designed to cover particular offenses against a person with a specific status, federal officers. Section 2B2.3 is designed to cover property offenses.

The language of Count Four, to which the Court is limited, says nothing about a crime against a person, or for that matter a crime against a federal officer. Instead, Count Four describes misconduct on Federal property. It is at heart an offense designed to allow for the smooth operation of government business at the Capitol. Section 2B2.3 is therefore the "most appropriate" guideline under § 2B2.3 cmt. n.1, and so is the applicable guideline for this offense.

D.  <u>Counts One through Four Should be Grouped.</u>

The Government argues that Count One and Count Two should be separated from Count Three and Count Four, such that a multiple-counts enhancement applies. However, all four counts should be grouped together because each count involves the same victim, the police officer.

> All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
>
> (a) When counts involve the same victim and the same act or transaction.
>
> (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan . . . .

U.S.S.G. § 3D1.2.

> The term *"victim"* is not intended to include indirect or secondary victims.  Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim . . . . Ambiguities should be resolved in accordance with the purpose of this section as stated in the lead paragraph, *i.e.*, to identify and group "counts involving substantially the same harm."

*Id.* § 3D1.2 cmt. n.2.

Here, the police officer who fell to the ground is the "one person who is directly and most seriously affected" by Mr. Council's offenses.  His acts of entering the Capitol and then barging into the police line, Count Three and Count Four, respectively, are connected by a common criminal objective, and involve the same victim, under § 3D1.2(b).  The Government would identify Congress as the "victim" of Count Three and Count Four.  But "victim" does not include "indirect or secondary" victims, and Congress the institution is not more "directly" and "seriously" affected by Mr. Council's offenses than the victim police officer.  In any event, ambiguities are to be resolved with reference to the grouping rules' lodestar, whether the counts "involve[] substantially the same harm."  Mr. Council's entry into the Capitol and disruptive conduct in the form of his making contact with the police officer involve substantially the same harm.  The first four counts should therefore be grouped together.

## II.  This Court should sentence Mr. Council to home detention, community service, and probation.

The statutory sentencing factors cut strongly in favor of a sentence of

26

probation and alternative sanctions.  First is Mr. Council's "history and characteristics" prior to the offense.  *See* 18 U.S.C. § 3553(a)(1).  At age 50, and despite a long history of severe mental illness, Mr. Council has no criminal convictions.  He has been a good father to Bria, and his character has shown through even when under the influence of his mental illness – he adopted three children from the foster system while his marriage was ending, and he ended his teaching career, and almost his life, after thinking he was saving a student from rape.  Even his rashest decisions were intended to benefit someone else, not himself.  Before that, he worked hard to help his students overcome adversity and succeed.

Next is the "nature of the offense."  *See id.*  Of course, Mr. Council was one member of a mob that took part in what is a great national embarrassment, and he made contact with the police officer while participating.  His offense is a serious one. But it is also significantly mitigated by the fact that Mr. Council was almost certainly in the midst of a manic episode at the time.  As Mr. Bradley will explain, he was lucid and calm on the way to Washington, but then woke at 3 a.m. on January 6 agitated and incessantly talking.  Spurred on by the president's speech, and then unfortunately left alone by his caretaker, he went on to exhibit all the characteristics of a bi-polar patient described by Dr. Machlus:  impulsivity, poor judgment, and reckless involvement in activities with a high potential for painful consequences. Barging into a line of Capitol Police to be arrested and pepper sprayed for at least the second time fits this description quite closely.

27

The Sentencing Commission recognizes that a sentence below the established guidelines range may be appropriate in circumstances such as these:  "Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines . . . ."  U.S.S.G. § 5H1.3.  These conditions are met here.  Not only does Mr. Council suffer from severe mental illness, he was suffering acute symptoms as he committed the offense.  This fact distinguishes his case from a typical case.  Many people chose to participate in the mob that day.  Most made that decision by bringing to bear all the moral decision-making tools of the average person.  Mr. Council, by contrast, labored under the influence of a manic episode, caused by a mental illness for which he is blameless.  This fact provides ample support for a downward departure under § 5H1.3.  What's more, there is no evidence that Mr. Council caused any injury, and he promptly expressed remorse for his actions after coming out of his seizure.

Next is Mr. Council's "history and circumstances" after the offense, *see id*., the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," *see id*. § 3553(a)(2)(D), and the need "to protect the public from further crimes of the defendant," *see id*. § 3553(a)(2)(C).  The mental-illness downward departure provision continues, "In certain cases a downward departure may be appropriate to

accomplish a specific treatment purpose.  *See* § 5C1.1, Application Note 7."

U.S.S.G. § 5H1.3.  The referenced application note explains:

> There may be cases in which a departure from the sentencing options authorized for Zone C of the Sentencing Table (under which at least half the minimum term must be satisfied by imprisonment) to the sentencing options authorized for Zone B of the Sentencing Table (under which all or most of the minimum term may be satisfied by intermittent confinement, community confinement, or home detention instead of imprisonment) is appropriate to accomplish a specific treatment purpose.  Such a departure should be considered only in cases where the court finds that (A) the defendant . . . suffers from a significant mental illness, and (B) the defendant's criminality is related to the treatment problem to be addressed.

> In determining whether such a departure is appropriate, the court should consider, among other things, (1) the likelihood that completion of the treatment program will successfully address the treatment problem, thereby reducing the risk to the public from further crimes of the defendant, and (2) whether imposition of less imprisonment than required by Zone C will increase the risk to the public from further crimes of the defendant.

*Id.* § 5C1.2 cmt. n.7.

Here again, each of the departure provision's requirements are easily met.  Mr. Council suffers from a serious mental illness and his offense at the Capitol was related to it.  Further, the continuation of Mr. Council's current mental health treatment plan has a high likelihood of success.  The combination of the medications, therapy, living arrangements, and abstention from marijuana and alcohol that arose after Mr. Council's most recent hospitalization have led to a

dramatic improvement in his condition.  He went from one who thought he was an admiral in the Space Force whose parents were spying on him and whose pretrial services officer was attempting to blow up the floor beneath him, to the father, son, and sibling his family remembers.  Mr. Council made it close to half a century without violating the law before January 6, 2021.  A properly medicated and cared for Matthew Council is a safe and law-abiding Matthew Council.  Thus, the need to provide Mr. Council with treatment dovetails with the need to protect the public from him.

None of the sentencing factors that might otherwise suggest a sentence of imprisonment outweigh these mitigating factors.  For example, while the seriousness of the offense suggests a need to provide "just punishment," that goal can be advanced by alternative sanctions like home detention and community service, and is otherwise outweighed by the factors bearing on his mental illness.  *See id.* § 3553(a)(2)(A).  Home detention would not be a lavish staycation for Mr. Council, who shares a room at an assisted-living facility with "Sweet Baby Rae," the multiple sclerosis patient.  Further, there is little need to deter Mr. Council, who has never done anything like this before and would never do so again.  *See id.* § 3553(a)(2)(B).  The Court's ability to rehabilitate Mr. Council through mental health treatment blunts any need to deter him.  And selecting probation rather than imprisonment allows the Court to supervise Mr. Council for two years longer than it would following a sentence of imprisonment.  *Compare* PSR ¶ 117 (noting a maximum term

30

of supervised release of three years) *with* PSR ⁋⁋ 131-134 (noting a maximum term of probation of five years).  Finally, general deterrence will be best achieved by the diligent and ongoing prosecutions of those involved at the Capitol, not the specific sentence imposed in this case.

Finally, to confirm that a sentence of probation is appropriate, such a sentence would be well within the range of sentences imposed by courts on "defendants with similar records who have been found guilty of similar conduct."  *See id*. § 3553(a)(6). As defense counsel will demonstrate at the sentencing hearing, the Sentencing Commission's available data indicates that defendants with Mr. Council's characteristics – sentenced under § 2A2.2 as the primary guideline, having pled guilty, with a sentencing zone of C and a criminal history category of I – were sentenced to probation only or a fine only in 17.3% of cases.  Another 4.3% of defendants were sentenced to a combination of prison and alternative sanctions.  The median sentence was 14 months' imprisonment, where a sentence of probation counts as 0 months' imprisonment.  From 2015 to 2021, courts varied below the guideline range in between 21.1% to 28.2% of cases sentenced under § 2A2.2 where the defendant had a criminal history category of I.  Of course, these data include only cases that proceeded to sentencing, and not cases in which charges were gratuitously dismissed by prosecutors, as has happened in other districts.

Congress requires the Court to seek to avoid "unwarranted" sentence disparities among similarly situated defendants.  *See id*.  Aligning Mr. Council's case

31

with the 17.3% of similar cases in which no imprisonment was imposed would not result in an "unwarranted" sentencing disparity.  Rather, his severe mental illness justifies such a sentence.

The best comparator case to Mr. Council's is *United States v. Rodean*, 1:21-CR-00057-TNM.  Mr. Rodean was one of the first rioters to enter the Capitol, after breaking through a glass window with a large object.  Once inside, he aggressively chased a police officer, indicating his purpose was to "stop the steal," and stood defiantly next to Jacob Chansley, the infamous "Q-Anon Shaman."  Mr. Rodean did not earn a downward adjustment for acceptance of responsibility, but rather was convicted after a trial.  However, Mr. Rodean suffered from rather serious autism, which this Court found contributed to his commission of the offense.  The Government recommended a sentence of 57 months' imprisonment, but this Court varied downward because of Mr. Rodean's mental illness, and imposed a sentence of probation and home detention.

No two cases are exactly the same, of course.  Mr. Rodean aggressively chased an officer but did not assault one; Mr. Council rather spontaneously ran into the officer once inside the building.  Mr. Rodean forced his way inside by destroying property; Mr. Council walked through an open door.  Mr. Rodean did not accept responsibility; Mr. Council pled guilty to all charges.  But on balance the two cases are quite close where it matters, especially as to the role of mental illness.  The Government proposes other comparator cases, but studiously avoids discussing Mr.

32

Council's mental illness.  A sentence of probation in this case presents no unwarranted disparity, either nationally or in Capitol riot cases specifically.

In conclusion, this Court should sentence Mr. Council to five years' probation with special conditions requiring home detention, community service, and mental health treatment.

DATED this 5th day of December 2022.

Respectfully submitted,

A. FITZGERALD HALL, ESQ.
FEDERAL DEFENDER

*/s Samuel E. Landes*
Samuel E. Landes, Esq.
D.C. Bar No. 1552625
Assistant Federal Defender
400 North Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone:   (813) 228-2715
Facsimile:   (813) 228-2562
Email:  Samuel_Landes@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th of December 2022, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to:

AUSA Sean P. Murphy.

*/s Samuel E. Landes*
Samuel E. Landes, Esq.
Assistant Federal Defender

33